JUDGE GARDEPHE

# 13 CV 2181

David N. Mair [DM-8883]
KAISER SAURBORN & MAIR, P.C.
111 Broadway
New York, New York 10006
(212) 338-9100

Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PAUL SILVERSTEIN,

                                        Plaintiff,

        -against-

WORDLOGIC CORPORATION,

                                        Defendant.
-------------------------------------------------------------x

**COMPLAINT**

(Jury Trial Demanded)

        Plaintiff, Paul Silverstein, by his attorneys, Kaiser Saurborn & Mair, P.C., as and for his

complaint against defendant, alleges as follows:

## PARTIES AND VENUE

1.      Plaintiff, Paul Silverstein, is a resident of the State of New York.

2.      Defendant, WordLogic Corporation ("WordLogic") is a corporation incorporated

under the laws of the State of Nevada, with its principal place of business in Vancouver, Canada.

WordLogic also maintains an office at 175 Varick Street, New York, New York.

3.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because

the claims asserted herein arise under the Dodd-Frank Wall Street Reform and Consumer

Protection Act, 15 U.S.C. § 78u-6(h)(1).

4.      Venue is properly laid in this District pursuant to 28 U.S.C. § 1391 because it is a

District in which the defendant resides.

5.     This is a whistleblower retaliation case brought by Silverstein against his former employer under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1).  As described in more detail below, Silverstein's appointment at President and CEO was rescinded, and he was constructively terminated as Chief Operating Officer, after he discovered, objected to and refused to conceal, substantial and ongoing fraud being perpetrated against the company by its former President and CEO who was, and remains, its largest shareholder.

### FACTS GIVING RISE TO THE CAUSES OF ACTION

**A.     The Parties**

6.     WordLogic's primary business is the development and commercialization of data entry software for handheld computing devices.

7.     WordLogic's common shares are listed in the United States on the OTC Bulletin Board (OTCBB), an electronic quotation system that displays real-time quotes, last-sale prices, and volume information for over-the-counter securities.

8.     Prior to joining WordLogic, Silverstein held a variety of senior executive positions in technology companies, including a company specializing in anti-money laundering compliance and fraud control technology solutions.  Before that he founded and led through its public offering on the NASDAQ a company that was an early pioneer of the Prepaid Phone Card Industry.

**B.     Silverstein's Tenure as COO of WordLogic**

9.     Silverstein was hired as WordLogic's Chief Operating Officer ("COO") in March

2012 by Frank Evanshen, WordLogic's President and Chief Executive Officer ("CEO"). Evanshen was also WordLogic's largest shareholder.

10.     Silverstein's duties included restructuring the company's operations and managing the company's operations, sales and marketing efforts. One of the primary reasons for his hiring was to help position the company to be acquired by the end of 2013.

11.     Over the course of the following eight months Silverstein recruited a number of key employees, including a Chief Technology Officer, a Chief Predictive Officer and a Controller. Silverstein also assumed overall responsibility for all of the company's sales and marketing and negotiated extremely cost-effective relationships with a video production company, an Indian web development company and a boutique UK public relations and marketing agency. These changes added substantial shareholder value and significantly improved perception of the company in the target marketplace.

12.     From the outset, however, Silverstein faced unexpected challenges as a result of allegations that Evanshen made fraudulent payments to himself from company funds. Thus, in July 2012, the Company negotiated a settlement with a former employee who alleged that Evanshen had siphoned off approximately $30,000 by writing company checks to the former employee which were then paid over in cash to Evanshen at his direction.

**C.   Evanshen's Decision to Resign as President and CEO Because His Prior Sex-Crime Conviction Would Have Prevented the Company From Obtaining Top-Tier Investment Bankers**

13.     Beginning in mid-November 2012, Charles Lawson, the company's Chief Predictive Officer, began discussions with investment banks that could help position WordLogic for a potential acquisition in 2013.

14.     In late November 2012, during the initial due diligence process undertaken by two leading global investment banks that were considering taking WordLogic as a client, both banks told Lawson that they had discovered that Evanshen had been convicted in 1999 of having sex with an underage female. Although the conviction was later overturned on appeal, these banks told Lawson that they were not willing to take the company on as a client with this cloud hanging over it. Moreover, Lawson advised Silverstein that, in his experience, potential acquisition partners and private equity firms would also not be willing to consider any deal with the company as long as Evanshen remained President or CEO.

15.     When Silverstein discussed this issue with Evanshen, Evanshen admitted that he had known the conviction "would be an issue" and agreed that he would resign as President and CEO in early December. He admitted to Silverstein that this was in the company's best interests, as well as his own interest as WordLogic's largest shareholder.

16.     Although Silverstein suggested that Evanshen consider other candidates, Evanshen insisted that Silverstein take over as President and CEO. Silverstein therefore agreed to take these positions.

17.     Evanshen told Silverstein that he would immediately obtain approval for Silverstein's appointment from T. Allen Rose, the only other member of WordLogic's Board of Directors, and committed to having a Board resolution issued to effectuate Silverstein's appointment as his replacement. It was widely known, both within the company and amongst its long-term shareholders, that Rose routinely rubber-stamped Evanshen's decisions.

18.     On November 28, 2012, Silverstein drafted a press release regarding his replacement of Evanshen as President and CEO and forwarded it by email to Evanshen for his

4

review.  Evanshen, in turn, forwarded it to the company's securities counsel for their review.

**D.**     **Silverstein's Discovery of Evanshen's Fraudulent Credit Card Expenses Totaling**
           **$110,000**

19.      WordLogic's Controller, Dan Lim, was aware that the CEO transition from
Evanshen to Silverstein was taking place.  Lim approached Silverstein on November 28, 2012
and warned him that WordLogic's corporate credit card account had a balance of $40,000 and
that he did not have sufficient available cash to pay the balance.  Silverstein, who had not
previously had any responsibility for reviewing or approving the credit card bills, was shocked at
the size of the outstanding balance.

20.      Silverstein immediately reviewed the November credit card statement and
discovered that Evanshen had run up tens of thousands of dollars of charges at local hotels and
restaurants.  He therefore demanded that Lim show him previous months' statements and
discovered that during the six-month period from June 2012 to November 2012, Evanshen
charged a total of $133,400 to the corporate credit card but allocated as "personal' and
reimbursed the company for only $23,600.  Hence, at Evanshen's express direction WordLogic
had paid $109,800 in credit card charges that Evanshen had incurred during that six-month
period alone.

21.      There was no conceivable business purpose for at least 95% of the expenses
Evanshen charged to the WordLogic credit card and these credit card expenses were fraudulently
charged by Evanshen to WordLogic.

22.      For example, the credit card statements show that during the 6-week period from
June 20, 2012 through August 5, 2012, Evanshen spent $5,478.30 at Revolucion Fine Cigars in

Vancouver but allocated only $1,464.39 of these charges as "personal" for purposes of reimbursing the company. In other words Evanshen fraudulently charged the company for an average of $670 per week for cigars during that period.

23.     Even more egregiously, during the six-month period for which Silverstein obtained credit card statements Evanshen charged the company $75,526.79 that were allocated as "meals and entertainment" business expenses. This equates to Meals and Entertainment charges averaging $425 per day, or $3,000 per week, and represents an annualized charge of more than $150,000.

24.     It immediately became apparent to Silverstein that at least 90 percent of these meals and entertainment charges could not even arguably be classified as business-related because Evanshen was not entertaining clients or prospects. A subsequent review of Evanshen's emails demonstrated that most of these charges were incurred by Evanshen in connection with alcoholic drinking binges with his brother, John Evanshen, and trysts with a woman who appeared from their email conversations to be his mistress.

25.     For example, more than one third of all of the meals and entertainment charges were incurred at two resorts in Whistler – a high-end resort community located three hours from the company's offices in Vancouver – and could serve no legitimate business purpose whatsoever. The charges fraudulently incurred on the credit card for the Fairmont Chateau Whistler and Four Seasons resorts during the six-month period amounted to $28,342. An additional $13,293 of the charges were incurred at the Fairmont Pacific Rim resort in Vancouver for a total of $41,635 at these three resorts alone. The review of Evanshen's emails confirmed that almost all of these charges appeared to relate to drinking binges with his brother.

6

26.     The magnitude of Evanshen's fraud is placed in perspective when the sum he embezzled through credit card fraud is compared with the $360,000 that was reported to shareholders as the consulting annual fee paid by WordLogic for Evanshen's services as President and CEO.  Put simply, Evanshen fraudulently obtained unauthorized payments amounting to an additional 30% of his legitimate compensation.

**E.     Silverstein Uncovers Additional Wire Fraud and Securities Fraud by Evanshen**

27.     In addition to Evanshen's credit card fraud, Silverstein also discovered that Evanshen routinely used WordLogic's bank accounts as his personal "piggy bank" to pay for personal expenses and financial needs.

28.     For example, in August 2012 Evanshen directed the company's controller to wire $10,269 to pay an invoice from the Sonora Resort for a three-day fishing trip for Evanshen and his brother.  Evanshen expressly instructed Lim by email to pay by wire from the company's account and book it as a "promotion and business entertainment" business expense.  A copy of the email exchange is annexed hereto as Exhibit "A."

29.     Silverstein also discovered that Evanshen routinely used WordLogic corporate funds to cover overdrawn balances in his personal accounts.  Evanshen's employment contract was entered into through a private corporation, Meridian Capital Corp, controlled by Evanshen.  Evanshen routinely overdrew his Meridian account which was located at the same Royal Bank of Canada ("RBC") branch as WordLogic's accounts.  Whenever this happened, the account manager at RBC would email Evanshen and Evanshen, in turn, would instruct WordLogic's Controller, Daniel Lim, to transfer funds from the WordLogic's account to the Meridian account to cover the overdraft.

7

30.     For example, Silverstein discovered emails documenting the following transfers during the months of October and November 2012 alone:

| | |
|---|---|
| October 1 | $20,000 |
| October 23 | $ 5,000 |
| November 6 | $ 5,000 |
| November 7 | $ 2,000 |
| November 13 | $ 3,000 |
| November 14 | $ 2,000 |
| November 26 | $ 3,000 |
| | ====== |
| | $40,000 |

31.     During certain periods of time these transfers were offset against the monthly consulting fees paid to Evanshen under a consulting agreement disclosed in the company's SEC filings.  However, by September 2012 the amount of these transfers to Evanshen's Meridian account had substantially exceeded the monthly consulting fees he was owed.  Lim therefore recorded these payments as "loans" to Evanshen and/or Meridian on the company's financial statements.  However, Evanshen wanted to conceal these loans from shareholders when the company filed its quarterly financial statements with the SEC for the period ended September 30, 2012.  Evanshen therefore instructed Lim to disguise them by retroactively booking a $90,000 offsetting "prepayment" of three months' of his consulting fees that had not yet been earned.  This false entry was reflected in WordLogic's Form 10-Q filing that was made with the SEC for the quarter ending September 30, 2012.

## F.     Silverstein's Refusal to Cover Up Evanshen's Fraud and His Subsequent Complaints to the Board's Audit Committee

32.     On the evening of November 28, 2012, after discovering the credit card fraud but before discovering the full extent of the other wire fraud and securities fraud, Silverstein emailed

8

Evanshen demanding that he immediately takes steps to remedy the issue.  In that email

Silverstein confirmed the events that had unfolded:

As we have agreed upon your retirement next week and my
transition to becoming President & CEO with regard to the
concerns of investment firms working with WordLogic, I have
started [gaining an] understanding of our corporate financial position.

As I have not been involved in the financial issues until today, I
had understood that we have enough cash reserves until December
2013. Needless to say, I was absolutely shocked and astounded to
see the credit card charges in the last few months incurred by you personally.

When I briefly discussed the shocking level of charges with Dan
[Lim], he told me he had tried to discuss them with you previously.
I know of your personal financial debts and tremendous pressures
to date for past taxes due and other personal commitments but to
utilize the company credit card to the current levels for the past
months is completely unacceptable.

Wordlogic is a public company and the funds must be utilized
solely for business purposes. With your monthly consulting fee of
$30,000 plus the tens of thousands of monthly credit card expenses
is not acceptable and would be red-flagged in an audit by our CPA.
We need to discuss the credit card charges immediately.

You are the President of Wordlogic and largest shareholder [and] I
am greatly concerned for this financial situation which is a serious
violation of a public company fiduciary responsibility ....

I want this company to be successful and all shareholder's to
receive maximum value, but if these issues aren't addressed and
fixed immediately, I am not able to work at WordLogic anymore.

A copy of Silverstein's November 28 email is annexed hereto as Exhibit "B."

33.    The following morning, on November 28, 2012,  Silverstein and Lim met with

Evanshen regarding his fraudulent credit card charges.  Silverstein confronted Evanshen with his

credit card fraud and told him flatly that his conduct amounted to "embezzlement and fraud."

During a heated meeting Evanshen argued that he had somehow been justified in incurring the

expenses, falsely arguing that Silverstein should drop the matter because Evanshen had

supposedly agreed to pay Silverstein "whatever he wanted" when he had initially hired him as COO. Ultimately when Silverstein threatened during that meeting to resign as COO if the matter was not dealt with appropriately, Evanshen agreed to resign immediately and destroy his corporate credit card.

34.    After the meeting, Silverstein worked with the firm's PR Firm to finalize the wording of the press release announcing Evanshen's resignation and Silverstein's appointment as President and CEO. The final version incorporated edits requested by Evanshen and its release was authorized by Evanshen.

35.    Later during the day of November 28, 2012, Evanshen again tried to persuade Silverstein to cover up his credit card fraud, suggesting to Silverstein that he could conceal the credit card expenses by having his brother fraudulently invoice the company for $100,000 as a "commission" for allegedly helping arrange a $5 million patent licensing deal entered into by the company eight months earlier and then offsetting the expenses against the fraudulent invoice. Silverstein again flatly rejected Evanshen's attempts to pressure him to help conceal Evanshen's fraud.

36.    At 7 a.m. Eastern Standard Time on November 30, 2012, the agreed-upon press release was publically issued announcing that Evanshen had resigned, effective immediately and that Silverstein had been appointed President and CEO. A copy of the press release is annexed hereto as Exhibit "C." Evanshen immediately began receiving calls and emails from investors and others who followed the company online.

37.    Silverstein assumed that Evanshen – as one of the company's two Directors – had followed the appropriate Board formalities to have Silverstein appointed as CEO prior to

11

issuance of the press release which Evanshen approved.  Although it now appears that Evanshen

failed in his obligation to do so prior to the press release being issued, later that morning

Evanshen emailed the company's securities counsel and instructed them to prepare a resolution

for his appointment.  Evanshen was also copied on emails with the bank relating to the transfer of

signing authority to Silverstein as the company's new CEO.

38.     Also on the morning of November 30, 2012, Evanshen signed a formal

resignation letter, resigning as President and CEO "effective immediately." A copy of the signed

resignation letter is annexed hereto as Exhibit "D."

39.     Within hours of the issuance of the press release, Evanshen tried to pressure

Silverstein to have WordLogic give him a "management consulting" contract with a monthly fee

of $30,000 to replace the compensation Evanshen was losing as a result of stepping down as

CEO.  He also again pressured Silverstein to forgive the fraudulent credit card expenses on

behalf of the company.  When Silverstein refused, Evanshen became extremely upset and also

complained that he had "no money for the weekend" – a reference to the fact that he was used to

using the company credit card and bank account as his personal "piggy bank."

40.     As of December 3, 2012, Evanshen had still failed to provide Lim, WordLogic's

Controller, with a copy of the board resolution appointing Silverstein as CEO which was required

by the bank as a prerequisite to finalizing Silverstein's signing authority over the company's

bank accounts.  Moreover, Evanshen told Lim that he would not sign any more checks or bank

wires, or take any additional steps to transfer signing authority to Silverstein, unless the

Company agreed to continue paying his management fees and to forgive the fraudulent credit

card expenses.

12

41.     On December 3, 2012, Silverstein therefore met with WordLogic's corporate

counsel, Farris, Vaughn, Wills & Murphy LLP ("Farris"), to obtain for the company the law

firm's advice regarding the issue of Evanshen's credit card fraud and conduct.  He provided

Farris with copies of the credit card statements and reconciliation spreadsheets demonstrating

Evanshen's fraud.

42.     On December 4, 2012, Farris wrote to Evanshen as WordLogic's counsel

memorializing his improper attempt to withhold transfer of signing authority and demanding that

Evanshen provide full cooperation in handing over authority to Silverstein.  Farris's December 4

letter also demanded that Evanshen cease such improper activity and cooperate in the transition:

> As counsel to the Company, our concern with your new approach
> is the conflict between your personal financial interests and the
> best interests of the Company. In the circumstances, your fiduciary
> and other duties to the Company require that you withdraw your
> demands and forthwith take all steps requested of you and follow
> all orders and instructions given to you by Silverstein ....
>
> Please immediately comply with the directives of the Company's
> management team, including Silverstein. If you refuse to do so, we
> expect to be instructed to take further steps, starting with a demand
> that you vacate the Company's premises and cease and desist from
> any interference with the Company's business. The Company
> reserves all rights and remedies against you.

43.     On December 4, 2012, Silverstein complained about Evanshen's fraud to Darrin

McCormack, the company's Chief Financial Officer and one of two members of the Board of

Directors' Audit Committee.[1]   Silverstein spoke by telephone with McCormack and provided

McCormack with a detailed account of Evanshen's credit card fraud together with Evanshen's

---

[1]     WordLogic has represented in SEC filings that, although McCormack is not a
member of the Board of Directors, he has been appointed by the Board to serve on its audit
committee together with Director T. Allen Rose.

improper attempts to pressure Silverstein into authorizing a "sham" consulting agreement whereby the company would continue paying him at the same level he was paid prior to stepping aside as CEO. Silverstein insisted in his conversation with McCormack that the company could not ignore Evanshen's fraud and must act to recover the funds he had embezzled. McCormack, who has had a longstanding business relationship with Evanshen, was non-committal in response.

44.     On the evening of December 4, 2012, and on December 5, 2012, Silverstein sent multiple emails to McCormack asking to meet in person. He also warned McCormack that he "will not sign off on [the fraudulent credit card charges] as 'commissions' to [Evanshen's brother] after the fact of the enormous credit card debt incurred at bars and restaurants." However, McCormack refused to meet with Silverstein and, after a further telephone conversation on the evening of December 5, 2012, subsequently ignored all additional emails from Silverstein on the subject of Evanshen's fraud.

## G.     Evanshen's Revocation of Silverstein's Appointment as President and CEO in Retaliation for His Refusal to Cover Up the Fraud

45.     By letter dated December 5, 2012, David Wotherspoon, a partner in the Vancouver-based law firm Fasken Martineau DuMoulin LLP, wrote to the Farris law firm claiming that he represented both Frank Evanshen and WordLogic. Despite the fact that Evanshen had resigned as President and CEO of WordLogic in writing five days earlier, Wotherspoon falsely asserted that Evanshen had not resigned any of his corporate officer positions and continued to hold them. Wotherspoon also falsely inferred that the personal credit card expenses fraudulently run up by Evanshen on the corporate credit card were somehow

"related to the $5 million infusion into WordLogic," a notion that is preposterous since all of the expenses were incurred months after the patent licensing deal that brought the cash infusion.

46.     In his December 5, 2012 letter, Wotherspoon also claimed that "Evanshen has decided that it is not in the best interests of WordLogic to carry through with [Silverstein's] appointment" as President and CEO of WordLogic.  Hence, Evanshen's legal counsel expressly admitted that Evanshen reversed his decision to appoint Silverstein to these positions after Silverstein refused to permit the concealment of Evanshen's fraudulent expenses and other payments.  These actions constituted blatant retaliation against Silverstein.  A copy of Wotherspoon's December 5, 2012 letter is annexed hereto as Exhibit "E."

47.     On December 6, 2012, Wotherspoon wrote to Silverstein, claiming that his law firm had been "retained by Frank Evanshen to give advice to him in his capacity as CEO of WordLogic."  In that letter Wotherspoon falsely alleged that Silverstein was not authorized to issue the November 30 press release, ignoring the fact that it had been approved by Evanshen.  Wotherspoon also claimed that "an investigation into [Silverstein's] conduct will be undertaken and that pending the outcome of that investigation [Silverstein was] suspended with pay" and was "not to come to work or to contact anyone regarding the affairs of the company."

48.     On the afternoon of December 6, 2012, the company issued a press release falsely claiming that the November 30 press release had been "inadvertently ... issued in error" and that Evanshen "remains as the Company's CEO and President."  Upon information and belief, the December 6 press release was issued at Evanshen's instructions.

49.     In sum, therefore, the Board of Directors and its audit committee quite literally "buried their heads in the sand" and ignored the blatant fraud perpetrated against the company by

its former CEO.  Moreover, they permitted the former CEO to rescind his resignation, continue running the company and remove Silverstein from any further role in the company, all in retaliation for Silverstein's uncovering – and refusing to participate in the concealment of – Evanshen's fraud.

50.     Under these circumstances Silverstein had no option but to resign his only remaining position as COO of the company because he had been prevented from fulfilling his fiduciary duties as an officer of a public company.  He submitted his resignation letter later on the evening of December 6, 2012.

51.     Notably, in yet another flagrant breach of U.S. Securities laws, the company has failed to file a Form 8-K Report with the SEC or otherwise make any public disclosure regarding Ms. Silverstein's departure – either as COO or as CEO.

52.     On February 14, 2013, David Raffa was appointed as the third – and only independent – member of WordLogic's Board of Directors.

53.     Raffa represented that "one of his first tasks" as a Director was to "undertake an investigation of the claims made by" Silverstein.

54.     On March 26, 2013, less than six weeks after his appointment, Raffa abruptly resigned as a member of WordLogic's Board.

55.     The results of Raffa's investigation were not publicly disclosed to shareholders and were not communicated to Silverstein.

## FIRST CAUSE OF ACTION

56.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "55" as if repeated and incorporated herein.

57.     WordLogic is required to file reports with the SEC under section 15(d) of the Securities Exchange Act of 1934.

58.     Evanshen used emails and telephone calls to perpetrate the foregoing credit card fraud and to obtain the foregoing fraudulent transfers for his benefit from WordLogic's bank accounts

59.     Silverstein reasonably believed the foregoing conduct by Evanshen and WordLogic constituted a violation of the U.S. mail and wire fraud statutes and the rules or regulations of the Securities and Exchange Commission

60.     Evanshen and WordLogic caused the company to file with the SEC financial statements that falsely categorized as legitimate company business expenses the foregoing non-business expenses paid to Evanshen and/or on his behalf.

61.     Evanshen and WordLogic's conduct violated the Securities Exchange Act of 1934 and the rules and regulations of the SEC.

62.     Silverstein complained about Evanshen's fraud to the Audit Committee of WordLogic's Board of Directors.

63.     WordLogic demoted, harassed, suspended and then actually and/or constructively discharged Silverstein because of his objections and complaints about the foregoing fraud and securities violations and his attempts to curtail such violations.

64.     WordLogic demoted, harassed, suspended and then actually and/or constructively discharged Silverstein because of his complaints and disclosures to the audit committee of WordLogic's Board of Directors.

65.     WordLogic demoted, harassed, suspended and then actually and/or constructively

17

discharged Silverstein because he made disclosures that were required and/or protected under laws, rules and regulations that are subject to the jurisdiction of the Securities and Exchange Commission, including but not limited to the Sarbanes-Oxley Act of 2002 and the Securities Exchange Act of 1934.

66.     By reason of the foregoing, WordLogic has violated 15 U.S.C. § 78u-6(h)(1) thereby causing Silverstein damages in an amount to be determined at trial but not less than $5 million.

**WHEREFORE**, plaintiff hereby demands judgment against defendant as follows:

(i)     On his first cause of action, awarding plaintiff damages of not less than $5 million, comprised of: (a) two-times the amount of his back-pay damages; and (b) front pay damages;

(ii)    Reimbursing plaintiff for his litigation costs, expert witness fees and attorneys' fees; and

(iii)   For such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a trial by jury.

Dated: New York, New York
       April 2, 2013

                            KAISER SAURBORN & MAIR, P.C.
                            Attorneys for plaintiff

By:    _____
                            David N. Mair [DM-8883]
                            111 Broadway
                            New York, New York 10006
                            (212) 338-9100

18

# Exhibit A

**Paul**

---

| | |
|---|---|
| **From:** | Dan Lim |
| **Sent:** | August-22-12 11:40 AM |
| **To:** | Frank Evanshen |
| **Subject:** | RE: Sonora Resort |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

| | |
|---|---|
| **Categories:** | Red Category |

Will do.

**Daniel Lim, Controller**

---

**From:** Frank Evanshen
**Sent:** Wednesday, August 22, 2012 8:36 AM
**To:** Dan Lim
**Subject:** FW: Sonora Resort

Wire the funds and book this as as promotion and business entertainment---Taking John the one who got the RPX $ 5mill

---

**From:** Wayne Lundin [mailto:wlundin@sonoraresort.com]
**Sent:** August-22-12 8:00 AM
**To:** Frank Evanshen
**Subject:** RE: Sonora Resort

As per the quote below – amount owed - **$10,268.76 CDN**

Thanks,

Wayne Lundin      Client Services Manager
Sonora Resort – Relais & Chateaux Property
Tel: 604 233-0460      Fax: 604 233-0465      Cell: 604 341-4995
Toll free in North America 888 576-6672
wlundin@sonoraresort.com      www.sonoraresort.com

   

Travelers Choice 2012 Winner; Top 25 for Canada in 3 categories: Hotel, Spa and Best Service.

---

**From:** Frank Evanshen [mailto:fevanshen@wordlogic.com]
**Sent:** August-22-12 7:56 AM
**To:** Wayne Lundin
**Subject:** RE: Sonora Resort

Send me wiring instructions this am. and total amt.

---

**From:** Wayne Lundin [mailto:wlundin@sonoraresort.com]
**Sent:** August-21-12 4:00 PM
**To:** Frank Evanshen
**Subject:** RE: Sonora Resort

Frank,

So if you did come – we would depart at 1:15pm from Seair Seaplanes – so you could get some fishing in from 3-7pm on the arrival

Thursday – 3 – 6pm (3)
Friday – 7-11am / 2-6pm (8)
Sat. 7-11am / 2-6pm (8)
Sun. 7 – Noon (5))

Depart Sonora at 4pm


Wayne Lundin      Client Services Manager
Sonora Resort – Relais & Chateaux Property
Tel: 604 233-0460      Fax: 604 233-0465      Cell: 604 341-4995
Toll free in North America 888 576-6672
wlundin@sonoraresort.com      www.sonoraresort.com

   

Travelers Choice 2012 Winner; Top 25 for Canada in 3 categories: Hotel, Spa and Best Service.

---

**From:** Frank Evanshen [mailto:fevanshen@wordlogic.com]
**Sent:** August-21-12 3:44 PM
**To:** Wayne Lundin
**Subject:** Re: Sonora Resort

Tomorrow

Sent from my HTC

----- Reply message -----
From: "Wayne Lundin" <wlundin@sonoraresort.com>
To: "Frank Evanshen" <fevanshen@wordlogic.com>
Subject: Sonora Resort
Date: Tue, Aug 21, 2012 3:32 pm


Frank,

You'll get Tommy for the Saturday and Sunday – I need a credit card to confirm this reservation....


Wayne Lundin      Client Services Manager
Sonora Resort – Relais & Chateaux Property
Tel: 604 233-0460      Fax: 604 233-0465      Cell: 604 341-4995
Toll free in North America 888 576-6672
wlundin@sonoraresort.com      www.sonoraresort.com

   

Travelers Choice 2012 Winner; Top 25 for Canada in 3 categories: Hotel, Spa and Best Service.

**From:** Frank Evanshen [mailto:fevanshen@wordlogic.com]
**Sent:** August-21-12 3:30 PM
**To:** Wayne Lundin
**Subject:** Re: Sonora Resort

Go ahead    remember the timing for fishing —Tommy would be great Sent from my HTC

----- Reply message -----
From: "Wayne Lundin" <wlundin@sonoraresort.com>
To: "Frank Evanshen" <fevanshen@wordlogic.com>
Subject: Sonora Resort
Date: Tue, Aug 21, 2012 3:11 pm



Frank,

**IF ALL LOOKS GOOD PLEASE CONFIRM BACK TO ME AS SOON AS POSSIBLE AND ILL GET THIS BOOKED.**

**August 23 – 26, 2012**
**Two Guests**
**Three Nights**
**Coho Lodge – Two Bedrooms**

| | |
|---|---|
| 2 Silver Rooms @ $675 per night x 3 nights | $4,050.00 |
| LAS Helicopter - $850 round trip per | $1,700.00 |
| Guided Salmon Fishing – 24 hours | $3,000.00 |
| Conservation Fee | $  120.00 |
| Carbon Surcharge | $  298.54 |
| 12% HST | $1,100.22 |
| **Total** | **$10,268.76 CDN** |

**Free upgrade to Gold Room (Coho Lodge)**
**Pay for 20 hours fishing and receive 4 free hours 8/8/8**

3

Wayne Lundin      Client Services Manager
Sonora Resort – Relais & Chateaux Property
Tel: 604 233-0460      Fax: 604 233-0465      Cell: 604 341-4995
Toll free in North America 888 576-6672
wlundin@sonoraresort.com      www.sonoraresort.com

   

Travelers Choice 2012 Winner; Top 25 for Canada in 3 categories: Hotel, Spa and Best Service.

---

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2012.0.2197 / Virus Database: 2437/5215 - Release Date: 08/21/12

---

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2012.0.2221 / Virus Database: 2634/5446 - Release Date: 12/08/12

**Wire Activity - Summary Report**

Daniel Lim , WORDLOGIC CORPORATIO
Report Creation Date: Aug 22, 2012 11:55:34 AM ET

Wire Activity for User: **Daniel Lim**

Value Date Range: From **Aug 22, 2012** To **Aug 22, 2012**

Debit Account(s): **All**                                        Status: **Completed**

Amount Range:  **All**

Payment Currency: **All**

---

**Payment Currency:   CAD**

| | |
|---|---|
| **Template Name:** | SONORA RESORT |
| **Template Description:** | SONORA RESORT |
| **Value Date:** | Aug 22, 2012 |

**Payment Amount:**     10,268.76 CAD

| | |
|---|---|
| **Debit Account:** | 00003-07120-1034313-CAD-WORDLOGIC CORPORATIO |
| **Credit Information:** | 00003-07120-1035443-CAD-LONDON ENTERPRISES LTD |
| **Beneficiary:** | LONDON ENTERPRISES LTD |
| **Status:** | Completed |
| **Approved by:** | Daniel Lim |
| **Created by:** | Daniel Lim, Aug 22, 2012 at 11:55 AM ET |
| **Last Modified by:** | |
| **Released by:** | Daniel Lim, Aug 22, 2012 at 11:55 AM ET |

---

**Total payment amount:**      10,268.76                  **Number of wire payments:**   1

*** End of report ***

1

# Exhibit B

----- Reply message -----
From: "Paul Silverstein" <psilverstein@wordlogic.com>
To: "Frank Evanshen" <fevanshen@wordlogic.com>
Subject: Tremendous concerns regarding company credit card utilization
Date: Wed, Nov 28, 2012 7:56 pm


Frank,

As we have agreed upon your retirement next week and my transition to becoming President & CEO with regard to
the concerns of investment firms working with WordLogic, I have started my understanding of our corporate
financial position.

As I have not been involved in the financial issues until today, I had understood that we have enough cash reserves
until December 2013. Needless to say, I was absolutely shocked and astounded to see the credit card charges in the
last few months incurred by you personally.

When I briefly discussed the shocking level of charges with Dan, he told me he had tried to discuss them with you
previously. I know of your personal financial debts and tremendous pressures to date for past taxes due and other
personal commitments but to utilize the company credit card to the current levels for the past months is completely
unacceptable.

Wordlogic is a public company and the funds must be utilized solely for business purposes. With your monthly
consulting fee of $30,000 plus the tens of thousands of monthly credit card expenses is not acceptable and would be
red-flagged in an audit by our CPA. We need to discuss the credit card charges immediately.

You are the President of Wordlogic and largest shareholder, besides hiring me to join your company as the Chief
Operating Officer, but I am greatly concerned for this financial situation which is a serious violation of a public
company fiduciary responsibility. Additionally, you hired Vantage and paid them $14,000 to be our "IR Firm", and
today their sales representative told me they "are not a IR firm" and you took responsibility for the decision.

I want this company to be successful and all shareholder's to receive maximum value, but if these issues aren't
addressed and fixed immediately, I am not able to work at WordLogic anymore.

Regards,
Paul
_____


On Mon, Jan 21, 2013 at 12:42 PM, David N. Mair <mair@ksmlaw.com> wrote:
I found another Dec 6 email in which you forwarded your Nov 28 email to McCormack
and others (it was out of order in binder). Can you please forward me an electronic
copy of your Nov 28 email because I want to cut and paste its text into the demand
letter - it's a very powerful email.

# Exhibit C

## YAHOO! FINANCE

# Paul Silverstein Appointed New President and CEO of Predictive Intelligence Company WordLogic Corporation

 **Press Release:** WordLogic Corporation – Fri, Nov 30, 2012 7:00 AM EST

VANCOUVER, BRITISH COLUMBIA--(Marketwire - Nov 30, 2012) - WordLogic Corporation (WLGC), the predictive intelligence technology company that creates patented solutions for mobiles, tablets, and desktops today announced that effective immediately, Frank Evanshen has decided to step down as CEO & President, with the current COO, Paul Silverstein, taking over the role of President and CEO.

"Paul Silverstein has demonstrated tremendous leadership and execution since he joined WordLogic this past April," said Frank Evanshen. "It is time for me to hand over the reins to Paul to lead the company and to execute on our strategic vision since the company was founded over a decade ago."

Frank Evanshen was one of the original investors and co-founder"s of WordLogic in 2000, becoming President & CEO in 2001. During his time leading WordLogic he spearheaded the company"s long-term strategic patent initiatives, which led to the successful licensing transaction for $5 million this past spring.

Frank Evanshen commented, "I am immensely proud of our new management team and all we have accomplished in the last six months. We were able to secure a significant patent licensing deal; launch our first Android predictive input keyboard, and I believe that an increasingly touch-technology driven world we are well-positioned to become a global leader for predictive input platforms in the future."

Paul Silverstein has been the Chief Operating Officer of WordLogic Corporation since April 2012. Mr. Silverstein has been an entrepreneur for the past 25 years, founding and building companies focusing on new technology and developing trends in the global marketplace. He had successfully led a company from inception to Nasdaq in three years and is recognized as one of the pioneers of the $10 billion prepaid telecom industry. Prior to his current position at WordLogic, Paul was an active President and Founder of a portfolio of six companies focused on meeting today"s economic requirements for on-demand talent, HR technology and security in the United States and India.

### About WordLogic Corporation

WordLogic Corporation (WLGC) develops, markets, licenses and sells advanced predictive platform software designed to accelerate information discovery and text input. The Company"s innovations operate on a wide variety of devices including smartphones, PCs, cell phones, Smart TV, media players, automotive navigational systems, infotainment and game consoles. The Company"s intellectual property portfolio includes six issued U.S. and European patents and three pending U.S. patent applications.

For more information about WordLogic Corporation, visit www.wordlogic.com. To send a message via Twitter contact us at www.twitter.com/wordlogiccorp or visit us on Facebook at www.facebook.com/wordlogiccorp. WordLogic headquarters are located at 1130 West Pender Street, Suite 230, Vancouver, BC, Canada.

Except for the historical information contained herein, the matters discussed in this news release are forward-looking statements and are subject to risks and uncertainties. See WordLogic"s filings with the US Securities and Exchange Commission which identify specific factors that may cause actual results or events to differ materially from those described in the forward-looking statements.

# Exhibit D

Franklin R. Evanshen
1130 West Pender St., Suite 230
Vancouver, BC Canada V6E 4A4

November 30, 2012

Board of Directors
WordLogic Corporation
1130 West Pender St., Suite 230
Vancouver, BC Canada V6E 4A4

Dear Sirs:

Effective immediately, I hereby resign from the positions of President and Chief Executive Officer of WordLogic Corporation, a Nevada corporation (the "Corporation"). I will maintain my position as a member of the Board of Directors of the Corporation.

My resignation is not due to any disagreement with the Corporation on any matter relating to the Corporation's operations, policies, practices, or otherwise.

Yours faithfully,

Franklin R. Evanshen

# Exhibit E

**Fasken Martineau DuMoulin LLP** ·
Barristers and Solicitors
Patent and Trade-mark Agents

2900 – 550 Burrard Street
Vancouver, British Columbia, Canada  V6C 0A3

604 631 3131  Telephone
604 631 3232  Facsimile
1 866 635 3131  Toll free

www.fasken.com



**David Wotherspoon**
Direct  604 631 3179
Facsimile  604 632 3179
dwotherspoon@fasken.com

December 5, 2012
File No.: 253729.14288/14288

**VIA EMAIL**

Farris, Vaughan, Wills & Murphy LLP
2500 – 700 West Georgia Street
Vancouver, BC  V7Y 1B3

**Attention:   Mike Wagner**

Dear Sirs/Mesdames:

**Re:      WordLogic Corporation**

We have been retained to respond to your letter of December 4, 2012 to Frank Evanshen.
Our letter is written on behalf of Mr. Evanshen and WordLogic.

Mr. Evanshen has not resigned from any of his positions at WordLogic Corporation. He
remains the CEO, President and Chairman of the Board.

The allegation in the third paragraph of your letter, that Mr. Evanshen was somehow
holding the company to ransom in forgiveness of certain credit card debt, is without
foundation. We are discussing with Mr. Evanshen how the issue of expenses paid that
related to the $5 million infusion into WordLogic should be best addressed by the
company.

Mr. Silverstein, from whom you took instructions on behalf of WordLogic in sending
your letter, has not been appointed as CEO or President or any other position beyond that
of COO. Although his appointment to CEO and President was in process, Mr. Evanshen
has decided that it is not in the best interests of WordLogic to carry through with the
appointment.  The board will soon consider Mr. Silverstein's ongoing role with the
company.

· Fasken Martineau DuMoulin LLP is a limited liability partnership and includes law corporations.

Vancouver      Calgary      Toronto      Ottawa      Montréal      Québec City      London      Paris      Johannesburg



Mr. Evanshen has also advised us that your firm acts for him in his personal capacity. For example, you have prepared his personal will. In the circumstances your firm is not entitled to act adverse to him on any matter, including the issues you raised in your December 4 letter. We trust that you will advise Mr. Silverstein to obtain independent legal advice, as has Mr. Evanshen.

Yours truly,

FASKEN MARTINEAU DuMOULIN LLP

David Wotherspoon

DKW/sml

DM_VAN/253729-14288/8477110.1